# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER NEWPORT,<br><br>  Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>  Defendants. | Case No. 1:23-cv-01752-SAB<br><br>ORDER VACATING HEARING ON DEFENDANT KAWEAH DELTA HEALTH CARE DISTRICT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION FOR SUMMARY JUDGMENT<br><br>(ECF No. 31) |

Before the Court is Defendant Kaweah Delta Heath Care District's (the "District") motion for summary judgment. Plaintiff Heather Newport and Defendant United States of America both filed non-oppositions to the motion. Pursuant to Local Rule 230(g), the Court has determined that this matter may be disposed of without a hearing. Based on the review of the motion, the evidence proffered, and the Court's file, the Court will grant the District's motion for summary judgment.

**I.**

**BACKGROUND**

Plaintiff is Heather Newport, a resident of Tulare, California. (ECF No. 13, ¶ 3.)[1]
Defendant Kaweah Delta Health Care District owns and operates Kaweah Health Medical Center

---

[1] Pursuant to Local Rule 260, the parties have provided the Court with a statement of undisputed facts, and the District has provided an expert declaration and the evidence supporting the undisputed facts. (ECF Nos. 31-3, 31-4.) This, along with the amended complaint and answers, constitutes the record on summary judgment, which the Court will cite where appropriate.

1  ("Medical Center") (erroneously sued as Kaweah Delta District Hospital).[2]  (Id. at ¶ 1; see ECF
2  No. 31-2.)  Defendant United States of America is sued pursuant to the Federally Supported
3  Health Centers Assistance Act, 42 U.S.C. § 233(g)-(n), which allows for the United States to be
4  a defendant for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401(b), 2671-
5  80, where a health care provider is considered an "employee of the Public Health Service."
6  (ECF No. 11, ¶ 4.)

7   On February 17, 2022, 1:46 p.m., Plaintiff was admitted to the Medical Center by Veena
8  Mamidi, M.D., ("Dr. Mamidi"), regarding spontaneous rupture of membranes connected with
9  impending childbirth.  (ECF No. 31-3, ¶ 3.)  At 2:24 p.m., Karin Reynoso, R.N., ("Reynoso")
10 contacted Dr. Mamidi and advised her that Plaintiff had arrived with complaints of water
11 breaking earlier that day at 9:00 a.m. and contractions beginning at 11:00 a.m.  (Id. at ¶ 4.)  At
12 3:01 p.m., Tamy Rojas, D.O., ("Dr. Rojas"), a resident doctor supervised by Dr. Mamidi,
13 examined Plaintiff.  (Id. at ¶ 5.)  Dr. Rojas observed that Plaintiff was contracting spontaneously
14 and there was no need for labor augmentation.  (Id.)  Dr. Rojas noted that she may start Plaintiff
15 on Pitocin, a drug that induces labor.  (Id.)  Per Plaintiff's request, Dr. Rojas provided pain
16 management.  (Id.)  Dr. Rojas stated that the anesthesia department was going to speak with
17 Plaintiff regarding an epidural.  (Id.)  At that time, Plaintiff has a regular diet and could ambulate
18 as tolerated, but Plaintiff was to have frequent position changes.  (Id.)  Dr. Rojas anticipated
19 Plaintiff would experience nausea and/or vomiting.  (Id.)

20  At 3:05 p.m., Jennifer Springs, R.N., ("Springs"), noted that Plaintiff had come in for a
21 labor check because she had suspected rupture of membranes.  (Id. at ¶ 6.)  Springs observed that
22 fetal movement was present and that Plaintiff was experiencing contractions every five minutes.
23 (Id.)  Plaintiff was leaking clear fluid but there was no bleeding.  (Id.)  Springs recorded that
24 Plaintiff had previously attended three or more visits of prenatal care and that Plaintiff had
25 previously given birth, virginally, to one child in May 2018 without fetal or neonatal
26 complications.  (Id.)  Plaintiff also described the circumstances surrounding her current
27
28 [2] The Court notes that while stylized on the docket as only the District's motion for summary judgment, the District and the Medical Center collectively moved for summary judgment.  (ECF No. 31, p. 1.)

1  pregnancy. (Id.)

2  At 5:27 p.m., Springs notified Dr. Mamidi that Plaintiff was having prolonged
3  decelerations for three-and-a-half minutes. (Id. at ¶ 7.) At 5:28 p.m., Springs requested Dr.
4  Mamidi come to Plaintiff's bedside immediately. (Id. at ¶ 8.) At 5:57 p.m., Springs notified Dr.
5  Mamidi of a fetal heart rate deceleration, and Dr. Mamidi was to evaluate Plaintiff. (Id. at ¶ 9.)
6  At 7:23 p.m., Hilary Golden, R.N., ("Golden"), informed Dr. Mamidi that Plaintiff was dilated to
7  10 centimeters that there was vaginal discharge of blood mixed with mucus that can indicate the
8  beginning of labor in late pregnancy. (Id. at ¶ 10.) Dr. Mamidi instructed Golden to have
9  Plaintiff start pushing and to notify Dr. Mamidi for delivery. (Id.)

10  At around 9:07 p.m., Dr. Mamidi performed a primary lower transverse cesarean section
11  due to recurrent prolonged decelerations and non-reassuring fetal heart tones during pushing.
12  (Id. at ¶¶ 11, 17.) During the cesarean procedure, 0.2 mg of Methergine was given to Plaintiff
13  through her thigh to help control bleeding. (Id. at ¶ 17.) Estimated blood loss following this
14  procedure was 600 milliliters. (Id.) At around 10:20 p.m., Dr. Mamidi was notified that Plaintiff
15  was hypotensive and tachycardic. (Id. at ¶ 12.) Golden observed that Plaintiff's uterus was firm
16  but high and deviated to the right; Dr. Mamidi was to evaluate Plaintiff. (Id. at ¶¶ 12, 17.) At
17  10:25 p.m., Dr. Mamidi assessed Plaintiff and removed large clots. (Id. at ¶ 13.) At this point,
18  Plaintiff's uterus was now below the umbilicus. (Id.) At 9:45 p.m., 60 units of Pitocin were
19  administered to Plaintiff by the anesthesia department, and Dr. Mamidi expressed several clots
20  from Plaintiff's vagina. (Id. at ¶ 17.) However, Plaintiff remained unstable, so the rapid
21  response team was called at 10:22 p.m. to administer blood. (Id.)

22  At around 10:35 p.m., the rapid response team arrived for hemorrhage status-post
23  cesarean section. (Id. at ¶ 14.) Gregory H. Cooper, R.N., ("Cooper"), recorded that Plaintiff's
24  systolic blood pressure was in the 80s, but her oral mucosa was pale. (Id.) Because there was a
25  concern of excess bleeding, two units of packed red blood cells were ordered. (Id.) There was
26  no real improvement following the units, so two more were ordered. (Id.) At this point, Plaintiff
27  had vaginal bleeding with frank red blood. (Id.) A massive transfusion protocol was started,
28  "and one round was getting." (Id.) In the end, Plaintiff received a total of eight packed red

1 blood cells, five fresh frozen plasma, one platelet, and "two cryo," along with magnesium, calcium, and one amp of bicarbonate. (Id.) Plaintiff was intubated because she was at a pH of 7.07, and then, she was moved to the intensive care unit for closer monitoring. (Id.)

At around 11:34 p.m., Dr. Mamidi recorded in an Operative Report that she would perform an abdominal supracervical hysterectomy, with the assistance of two other doctors, because of Plaintiff's postpartum hemorrhage and failed conservative measures. (Id. at ¶ 15.) Dr. Mamidi recounted that following the caesarean section surgery, a nurse noticed bloody urine in Plaintiff's foley and called Dr. Mamidi to evaluate. (Id.) Dr. Mamidi had evaluated Plaintiff as hypotensive and tachycardic. (Id.) Dr. Mamidi noted that 1,000 milliliters of blood clots were removed from Plaintiff's vagina. (Id.) Cytotect, 800 milligrams (to prevent bleeding), and Pitocin were administered; Plaintiff had already been given Methergine. (Id. at ¶¶ 15, 17.) Dr. Mamidi then described the massive transfusion protocol and the specifics of the events leading to the decision to administer the hysterectomy surgery. (Id. at ¶ 15; see id. at ¶ 17.) Between approximately 12:23 a.m. and 2:05 a.m., on February 18, 2022, Dr. Mamidi performed a hysterectomy surgery on Plaintiff with no complications. (Id. at ¶ 17.) Following the surgery, and once hemostasis was secured, a count of laparotomy sponges was conducted, and Dr. Mamidi noted that one of the sponges was missing. (Id. at ¶ 15; see id. at ¶ 17.) An X-ray revealed the location of the sponge in Plaintiff, and it was removed. (Id.) At around 3:00 a.m., Plaintiff was hemodynamically stable and was transferred to the intensive care unit for monitoring. (Id. at ¶ 16.) In total, Plaintiff's estimated blood loss was of "4,550." (Id. at ¶ 17.)

On December 21, 2023, Plaintiff commended this action against solely the United States. (ECF No. 1.) Following litigation not relevant here, Plaintiff filed an amended complaint on May 10, 2024, against the United States as well as Kaweah Delta Health Care District and "Kaweah Delta District Hospital." (ECF No. 13.) Plaintiff's sole cause of action is medical negligence against Dr. Mamidi and "the agents and employees of" the District. (Id. at ¶ 7.) Plaintiff prays for economic and non-economic damages, costs, and prejudgment interest. (Id. at pp. 2-3.) The parties consented to the jurisdiction of a magistrate judge for all purposes, and the case was reassigned to the undersigned. (ECF Nos. 24, 25, 26, 28, 29.) On February 4, 2025,

the District filed its motion for summary judgment. (ECF No. 31.) On February 18, 2025, Plaintiff and United States filed their notices of non-opposition. (ECF Nos. 33, 34.)

## II.

## LEGAL STANDARD

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (cleaned up). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. Celotex, 477 at 324. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 588 (1986). Rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Should the non-moving party fail to produce evidence that supports its claim or defense, courts enter judgment in favor of the movant. Celotex, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most

1  favorable to the non-moving party, drawing all justifiable inferences in that party's favor. AXIS
2  Reinsurance Co. v. Northrop Grumman Corp., 975 F.3d 840, 844 (9th Cir. 2020).  If, as to any
3  given material fact, evidence produced by the moving party conflicts with evidence produced by
4  the nonmoving party, the Court must assume the truth of the evidence set forth by the
5  nonmoving party with respect to that material fact. Furnace v. Sullivan, 705 F.3d 1021, 1026
6  (9th Cir. 2013).  "[T]he mere existence of *some* alleged factual dispute between the parties will
7  not defeat an otherwise properly supported motion for summary judgment; the requirement is
8  that there be no *genuine* issue of *material* fact." Scott v. Harris, 550 U.S. 372, 380 (2007)
9  (emphasis in original), quoting Anderson, 477 U.S. at 247-48.  In ruling on a motion for
10 summary judgment, a district court may not engage in credibility determinations or weigh
11 conflicting evidence. Manley v. Rowley, 847 F.3d 705, 711 (9th Cir. 2017).

## III.

## DISCUSSION AND ANALYSIS

14     The District argues that it is entitled to summary judgment because it has provided
15 evidence that there was no breach of the standard of care regarding the treatment Plaintiff
16 received from the District's nursing, resident, non-attending physician, and non-midlevel staff.
17 (ECF No. 31-2, p. 11.)  The District also argues that that Plaintiff cannot demonstrate that the
18 nursing, resident, non-attending physician, and non-midlevel staff were a substantial factor in
19 causing the alleged harm to Plaintiff. (Id. at p. 14.)  While Plaintiff does not oppose the motion
20 (ECF No. 33), the Court must still review whether the District has met its initial burden for
21 summary judgment. Celotex, 477 U.S. at 323.

22     The District has provided a declaration from expert witness Kristy Fisher, RNC-OB,
23 BSN, CLNC ("Fisher"). (ECF No. 31-3.)  Fisher is a registered nurse licensed to practice in the
24 State of California.  (ECF No. 31-4, p. 4.)  Currently, Fisher is a StaffRN in the Labor and
25 Delivery Department at Kaiser Permanente Medical Center in Panorama City, California.  (Id. at
26 p. 5.) Attached to her declaration, Fisher has included a copy of her curriculum vitae. (Id. at pp.
27 4, 14-15.) In 2000, Fisher graduated with a Bachelor of Science in nursing from Mount Saint
28 Mary's College located in Los Angeles, California.  (Id. at p. 5.)  Fisher is nationally certified in

1 inpatient obstetrics and is a "Certified Legal Nurse Consultant," having completed the CLNC
2 Certificate Program at the Vickie Milazzo Institute. (Id.) Fisher is an active member of the
3 Association of Women's Health, Obstetric and Neonatal Nurses and the National Alliance of
4 Certified Legal Nurse Consultants. (Id.) Fisher is certified in Advanced Fetal Monitoring,
5 Advanced Cardiac Life Support, Basic Cardiac Life Support and is certified as a Neonatal
6 Resuscitation Provider. (Id.)

7 Fisher was retained by the District as an expert witness with the scope of reviewing the
8 applicable standard of care as to nursing, non-attending physician, and non-midlevel staff, as
9 well as whether any act or omission by the District's nursing, non-attending physician, and non-
10 midlevel staff was a substantial factor in causing Plaintiff's alleged injuries. (Id.) With her
11 professional experience as a licensed registered nurse in labor and delivery at an acute care
12 facility, Fisher states that she has seen numerous patients with conditions similar to those
13 exhibited by Plaintiff. (Id.) Therefore, Fisher is familiar with the standard of care that was
14 applicable during the incident as well as the current standard of care. (Id.)

15 In drawing her conclusions, Fisher relied on her education, background, and professional
16 experience, as well as reviewing the complaint, Plaintiff's medical chart, imaging studies, and
17 fetal monitoring strips from the District, Plaintiff's medical chart from Family Healthcare
18 Network Visalia, Plaintiff's medical chart from Raj Dwivedi, M.D., and Plaintiff's medical chart
19 from Latif Ziyar, M.D. (Id. at p. 6.)

20 Fisher began by summarizing the facts as the Court has described above. (Id. at pp. 6-
21 10.) Fisher then outlined that it is Plaintiff's contention that on February 17, 2022, the District's
22 nursing, non-attending physician, and non-midlevel staff were negligent by failing to properly
23 care for and treat Plaintiff during her caesarian section, resulting in mass blood loss. (Id. at p.
24 10.) It is also Plaintiff's contention that she went under a hysterectomy that she did not consent
25 to and that during that procedure, a laparotomy sponge was left inside Plaintiff, which required
26 Plaintiff to have a third surgery. (Id.)

27 Fisher opined that the scope of practice for nursing, non-attending physician, and non-
28 midlevel staff at an acute care facility does not include the decision to perform a hysterectomy,

7

1  diagnosing or ordering treatment for patients, or obtaining informed consent prior to a procedure.
2  (Id.)  With a reasonable degree of medical probability, following review of the records Fisher
3  further opined that "the nursing, non-[attending] physician, and non-midlevel staff at [the
4  District] met the applicable standard of care in all regards." (Id. at p. 10.)  Fisher explained that
5  decelerations are not uncommon and that in this case it never reached a "category 3."  (Id.)
6  Fisher opined that with the decelerations, appropriate interventions were performed by staff and
7  that the nurses notified the physician.  (Id.)  Regarding the caesarian section procedure, Fisher
8  observed that the nurses noted that Plaintiff was hemorrhaging and called the physician back in,
9  which Fisher opined was appropriate.  (Id.)  Moreover, Fisher opined that the nurses were
10 responsive and timely in performing transfusions and carrying out physician orders.  (Id. at p.
11 11.)

12      Following the hysterectomy, a count of laparotomy sponges was performed by a nurse
13 and scrub tech and a sponge was noted as unaccounted.  (Id.)  An X-ray was performed, and the
14 sponge was removed prior to Plaintiff being closed up and prior to Plaintiff being taken to the
15 recovery room.  (Id.)  Fisher opined that, within the scope of her review, this incident was
16 handled appropriately within the standard of care.  (Id.)  Fisher further opined that the retained
17 sponge and its removal did not contribute to Plaintiff's hemorrhaging or other alleged injuries.
18 (Id.)

19      The Court finds that the District has met its initial burden of producing evidence negating
20 essential elements of Plaintiff's medical malpractice claim as to the District's nursing, non-
21 attending physician, and non-midlevel staff.  See Celotex, 477 U.S. at 323.  Significantly, the
22 Court observes that Plaintiff explicitly does not dispute Fisher's credentials, her expert opinion
23 as to the standard of care for nursing, non-attending physician, and non-midlevel staff, or her
24 expert opinion regarding that nursing, non-attending physician, and non-midlevel staff were not a
25 substantial factor in causing Plaintiff's alleged injuries. (ECF No. 31-3, pp. 10-13.)  Because
26 Plaintiff has filed a non-opposition, the Court concludes that the District is entitled to summary
27 judgment as a matter of law.  Celotex, 477 U.S. at 323; Fed. R. Civ. P. 56(a).

28                                              **IV.**

**CONCLUSION AND ORDER**

The Court concludes that the District is entitled to summary judgment as a matter of law as to the District's nursing, non-resident physician, and non-midlevel staff. Accordingly, the Court hereby ORDERS that the District's motion for summary judgment is GRANTED. (ECF No. 31.)

In light of the foregoing, the Court VACATES the April 9, 2025 hearing on the motion for summary judgment and DIRECTS the Clerk of the Court to terminate Kaweah Delta Health Care District and Kaweah Delta District Hospital as Defendants in this matter.

Given that the only remaining cause of action is medical negligence against the United States, brought through the Federal Tort Claims Act, the Court DIRECTS Plaintiff and Defendant United States to file a joint status report within **ten (10) days** of entry of this order, regarding whether this matter should be converted to a bench trial.

IT IS SO ORDERED.

Dated:  **February 21, 2025**

STANLEY A. BOONE
United States Magistrate Judge

9